# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CHARLES C. APPLEBY,<br>2658 Sims Cove Lane<br>Jacksonville, Florida 32223<br><br><br>*Plaintiff,*<br><br>v.<br><br>THE HONORABLE<br>FRANCIS J. HARVEY,<br>Secretary of the Army<br>Department of the Army<br>120 Army Pentagon<br>Washington, DC 20310-1020<br><br>*Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.

## COMPLAINT
**Review of Decision of Army Board for the Correction of Military Records;
Violation of U.S. Constitution; Violation of Army Regulations;
Violation of Federal Statute;**

### I. <u>JURISDICTION AND VENUE</u>

1) This Court has jurisdiction under 28 U.S.C. § 1331. Plaintiff raises claims arising under the U.S. Constitution, federal statutes, and military regulations.

2) The Act of Congress upon which federal question jurisdiction rests is the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. (2000), which permits a federal court to review decisions of the Army Board for the Correction of Military Records.

3) Venue is proper because Defendant is a resident of the District of Columbia.

## II.  **THE PARTIES**

4) Charles C. Appleby, Plaintiff, is a retired Florida Army National Guard ("FLARNG") officer. Plaintiff resides at the address provided in the caption above.

5) Francis J. Harvey, Defendant, is the Secretary of the Army. Defendant's official place of business is the address provided in the caption above.

## III.  STATUTE OF LIMITATIONS AND
## EXHAUSTION OF ADMINISTRATIVE REMEDIES

6) Plaintiff was involuntarily retired from the FLARNG on July 31, 2001.

7) On August 11, 2005, the Army Board for the Correction of Military Records ("ABCMR") entered a final decision on Plaintiff's application for the correction of records.

8) Plaintiff has exhausted all administrative remedies.

9) 28 U.S.C § 2501 requires the filing of a claim before this court within six (6) years after such claim first accrues.

10) Plaintiff's claim first accrued on July 31, 2001, when he was retired from the Army.

11) Plaintiff's complaint is timely filed.

12) Plaintiff's complaint is not barred by any statute of limitations.

## IV.  **STATEMENT OF FACTS**

13) In March, 1999, Colonel ("COL") Appleby was selected by the Adjutant General (ATAG@) of the Florida National Guard (AFNG@) to assume command of a Florida National Guard Major Command, and to serve simultaneously as the Deputy Commanding General of the 32d Army Air and Missile Defense Command (an active duty Army Headquarters).

14) He formally assumed command on June 5, 1999 and began the process of nomination and approval for promotion to Brigadier General.

15) COL Appleby=s selection for promotion to Brigadier General was announced by the Secretary of Defense on July 27, 2000, and was submitted by the President to the Senate for confirmation on September 13, 2000.

16) On September 26, 2000, an anonymous complaint was made with the Inspector General ("IG"), FLARNG, alleging that COL Appleby had reprised against the complainant for making a protected communication.

17) The IG forwarded the complaint to the Department of the Army Inspector General ("DAIG") on or around September 28, 2000.

18) The DAIG treated the complaint as falling within 10 U.S.C. ' 1034, the AMilitary Whistleblower Protection Act.@

19) On October 3, 2000, Major General ("MG") Ronald O. Harrison, TAG, FNG, informed COL Appleby via telephone that he was being temporarily removed from the General Officer (AGO@) promotion list at the behest of the DAIG.

20) On October 6, 2000 MG Joseph R. Inge, the Deputy DAIG, contacted COL Appleby and advised him that a reprisal complaint had been filed against him only hours before his promotion was to be confirmed.

21) COL Appleby was provided no details surrounding the complaint, such as the identity of the complainant, the nature of the allegations, nor the time-frame to which the complaint pertained.

22) MG Inge assured COL Appleby that the resulting inquiry would receive top priority and likely would be resolved within 3-4 days.

23) During the initial stages of the processing of the complaint, the DAIG assured COL Appleby that the complaint would be handled expeditiously, an assurance that was repeated by the DAIG throughout the investigation.

24) Based on the complaint, the Army immediately withheld COL Appleby=s name from the list of officers whose promotions were confirmed by the Senate in October, 2000.

25) On January 3, 2001, COL Urrutia, Chief of Staff, DAIG, informed COL Appleby that the inquiry was complete and had been submitted for legal review, which he expected to be completed within one week.

26) On January 16, 2001, MG Harrison contacted COL Appleby and indicated that the whistleblower reprisal allegation was unsubstantiated, but that questions as to the procedural propriety of an Officer Efficiency Report (AOER@) had arisen during the course of the inquiry.

27) On January 24, 2001, COL Urrutia contacted COL Appleby and indicated that that the DAIG was requesting authority from General Keane, the Vice Chief of Staff of the Army, to conduct an IG Investigation.

28) On January 31, 2001, General Keane issued a Directive for Investigation, instructing the DAIG to Ainvestigate alleged improprieties by senior officials,@ including COL Appleby.

29) The primary allegation against COL Appleby was that he had reprised against a subordinate officer for making a protected communication under the Military Whistleblower Protection Act, 10 U.S.C. ' 1034.

30) On May 16, 2001, the DAIG obtained approval from General Keane for an expanded investigation to include allegations of reprisal for making protected communications involving two additional officers who had not filed complaints against COL Appleby.

31) The original reprisal complaint was unsubstantiated in the early stages of the IG process.

32) The additional reprisal allegations stemmed from Letters of Concern ("LOC") issued by COL Appleby to MAJ Hulen and LTC Bacon.

33) The LOCs provided the sole basis for the DAIG=s consideration of the additional reprisal allegations.

34) On July 9, 2001, MG Inge informed COL Appleby that General Keane had approved the IG=s Report of Investigation (AROI@).

35) MG Inge also advised COL Appleby that the mitigating circumstances noted in the ROI should permit his nomination to proceed directly to the Senate for confirmation.

36) On July 9, 2001, COL Appleby submitted a Freedom of Information Act request for the ROI.

37) On July 13, 2001, COL Appleby wrote COL Bruce Davis, Chief of Staff, FLARNG, stating, "I will receive a report from the Vice/TJAG [The Judge Advocate General] to which I will have 30 days to respond. …I hereby demand my right for experienced and competent legal representation to assist in that response. Can I be in a retired status and do all that? If not, I would like to be transferred to a non-drill status that would allow that."

38) COL Davis informed COL Appleby that he would have to repeat the entire promotion selection process which normally takes 6-9 months to complete. That information was incorrect.

39) On July 16, 2001, COL Appleby underwent unexpected surgery for colon cancer. Due to post-operative complications, he remained hospitalized for 14 days.

40) By letter dated July 17, 2001, while COL Appleby was still hospitalized, the DAIG notified COL Appleby of its completion of the investigation.

41) Before COL Appleby was released from the hospital, he received orders involuntarily retiring him for maximum years of service, effective July 31, 2001.

42) On August 21, 2001, 21 days after he was involuntarily retired, COL Appleby received a highly redacted copy of the ROI.

43) The ROI substantiated three allegations against COL Appleby: 1) he failed to ensure that a subordinate commander was properly relieved from a command position; 2) he improperly prepared and processed an annual OER; and 3) he reprised against two officers for making protected communications.

44) On September 10, 2001, COL Appleby complained to Thomas E. White, Secretary of the Army. COL Appleby received no response from Secretary White.

45) COL Appleby began chemotherapy treatment during the first week of September, 2001. After suffering an extreme reaction to the treatment, he was hospitalized for two weeks.

46) On October 19, 2001, based on the DAIG investigation, MG Keane issued COL Appleby a LOC.

47) The LOC was not filed in COL Appleby's Official Military Personnel File ("OMPF").

48) On July 9, 2002, COL Appleby complained to Ander Crenshaw, U.S. House of Representatives.

49) Rep. Crenshaw's office issued an inquiry which was forwarded to the DAIG on or around October 4, 2002.

50) By letter dated June 12, 2003, the DAIG informed Rep. Crenshaw that "COL Appleby was voluntarily retired effective July 31, 2001. As a result, COL Appleby was properly deleted from the list of officers recommended for Federal recognition to the higher grade, subsequent to his placement in the Retired Reserve."

<strong>Application to the ABCMR</strong>

51) On March 23, 2003, COL Appleby filed an application with the ABCMR requesting that the Board: (1) direct that he be promoted by operation of law to the rank of Brigadier General; (2) remove the Letter of Concern from his military personnel file; (3) award him all back pay, allowances, and benefits to which he is entitled; (4) retire him at the rank of Brigadier General with all associated rights, benefits, and privileges or, alternatively, reinstate him to the FLARNG at the rank of Brigadier General, crediting him with service in the rank of Brigadier General from the date he otherwise would have been promoted to the date of reinstatement.

52) By memorandum dated September 30, 2004, the ABCMR provided COL Appleby with an advisory opinion prepared by the National Guard Bureau.

53) The advisory opinion recommended to the Board that COL Appleby be promoted to Brigadier General.

54) On August 11, 2005, the ABCMR denied COL Appleby's application.

<strong>Background to the DAIG Complaint and Investigation</strong>

55) At the time COL Appleby assumed command, numerous serious leadership issues affecting the command climate existed.

56) Most problematic was 3rd Battalion, 265th Air Defense Artillery.

57) Prior to COL Appleby=s assumption of command, the former commander, Brigadier General ("BG") Neff, had ordered an investigation into allegations that a non-commissioned officer ("NCO"), Staff Sergeant ("SSG") Shrout, had forged signatures on official supply documents.

58) Based on the results of that investigation, BG Neff approved the investigating officer=s (AIO@) recommendation that the NCO=s Active Guard and Reserve status be terminated.

59) Shortly after assuming command, COL Appleby received the paperwork required for terminating the NCO=s status.

60) In accordance with the applicable regulation, the subject NCO submitted a rebuttal for COL Appleby=s consideration.

61) Because the rebuttal raised command-related issues not addressed by the IO, COL Appleby appointed a new IO, Major ("MAJ") Barselou, to investigate the matters raised in the rebuttal.

62) The IO reported to COL Appleby on December 14, 1999, and raised issues of serious concern over the conduct of a Company Commander, CPT Ward, and the Battalion Executive Officer, MAJ Hulen.

63) The investigator concluded that the allegations of forgery against SSG Shrout were unsubstantiated.

64) Because of the seriousness of the matters uncovered by the investigation, COL Appleby directed a review of the IO=s report, along with recommendations for action, from his Deputy Commander, the Staff Judge Advocate (ASJA@), and the IG.

8

65) Those officers provided their comments and recommendations to COL Appleby on or around January 9, 2000.

66) COL Appleby indicated to those officers that he would consider their recommendations only after a face-to-face meeting with the Battalion Commander.

67) On January 14, 2000, COL Appleby met with the Battalion Commander, Lieutenant Colonel ("LTC") Bacon, and provided him with a copy of the investigative report along with a summary of the allegations prepared by the Deputy Commander, the SJA, and the IO.

68) LTC Bacon reviewed the information and determined that: 1) Captain ("CPT") Ward should be relieved of his command and referred for Courts-Martial; 2) First Lieutenant ("1LT") Douglas S. Digby should be given non-judicial punishment under Article 15 of the UCMJ (10 U.S.C. § 815) and transferred to a different unit; and 3) MAJ Hulen should receive a Letter of Reprimand (ALOR@).

69) The decision to initiate these actions was within the command authority of LTC Bacon.

70) LTC Bacon did not ask COL Appleby to formally approve CPT Ward=s relief of command or Courts-Martial.

71) CPT Ward resigned his commission after LTC Bacon relieved him from command.

72) COL Appleby was unaware of the adverse action taken by LTC Bacon until after CPT Ward had resigned.

73) The allegations of misconduct that gave rise to the investigation against CPT Ward and the other officers included credible evidence that CPT Ward had abused soldiers under his command in front of other soldiers and had made threats against one soldier.

74) The allegations of abusive treatment were made by several different soldiers under penalty of perjury.

75) The allegations strongly indicated the existence of serious command climate and morale problems that were undermining the effectiveness of the unit.

76) Other command issues that arose before and shortly after COL Appleby assumed command involved allegations of sexual harassment and criminal conduct.

77) In addition, there were generalized concerns that the battalion was in disarray and that morale was suffering.

78) A memorandum from Command Sergeant Major ("CSM") Wilkinson, the senior Non-Commissioned Officer of the Command and a member of COL Appleby's personal staff, who conducted a visit to the battalion, to COL Appleby demonstrated that serious leadership issues existed within the battalion that required urgent correction.

79) CSM Wilkinson observed that while A[t]he soldiers of the 3rd Battalion are highly motivated and eager to do the job, they are desperately looking to their leadership for help.@

80) As a result of these serious concerns, on March 3, 2000 COL Appleby again appointed MAJ Barselou to conduct an additional investigation regarding concerns over forged signatures on supply room documents.

81) That investigation also concluded that the allegations of forgery against SSG Shrout were unsubstantiated.

82) The investigation did raise very serious issues about the leadership and integrity of key battalion officers, notably MAJ Hulen and LTC Bacon.

83) COL Appleby directed that his Deputy Commander, the SJA, the IG, and his Administrative Officer ("AO") review the report of investigation for legal sufficiency.

84) Those officers determined that the investigation was conducted properly.

85) On May 30, 2000 the SJA wrote COL Appleby and provided a summary of the investigative results.

86) The SJA concluded that there was no loss of property and no forgery was committed.

87) He further noted that MAJ Hulen and LTC Bacon apparently had made statements under oath that were not supported by the evidence.

88) After carefully considering the two AR 15-6 investigations and the assessments thereof provided by the SJA, COL Appleby determined that the evidence that the two officers had made false official statements was not conclusive.

89) COL Appleby concluded that both officers should be counseled regarding their conduct, which COL Appleby chose to do by way of letters of concern.

90) COL Appleby directed his SJA, LTC R. B. Davis, to prepare the letters of concern for his Battalion Commander and Battalion Executive Officer. COL Appleby approved and signed the letters.

91) The letters of concerns, dated June 6, 2000, addressed the management and supervisory failures of those two officers as documented by the AR 15-6 investigations, which themselves had been reviewed and approved by FLARNG legal officers and the Inspector General.

92) In the LOC to LTC Bacon, COL Appleby directed him to Aassure that all subordinates use proper personnel management procedures...or that they establish some other Army-approved management system, for supervising all AGR soldiers...[and] insure that no further allegations of

11

misconduct [be] sent to this headquarters unless your command carefully screens the allegations for bias, objectivity, validity and accuracy.@

93) COL Appleby did not tell LTC Bacon not to report allegations of misconduct, as later alleged by the DAIG, and did not counsel LTC Bacon for having reported the alleged misconduct.

94) The LOC to MAJ Hulen provided that Awithin 30 days of the receipt of this letter, you shall establish and implement an Army-approved personnel management policy...or another office management procedure approved by the U.S. Army Institute of Administration...you shall also provide your Battalion Commander with a copy of written goals and objectives, task lists and worksheets for each AGR soldier under your leadership....@

95) COL Appleby specifically advised the two officers in the LOCs themselves that the LOCs were not official reprimands and would not be placed in the officers= Official Military Personnel Files.

96) The LOCs resulted in no adverse action against the officers and served only as written counseling statements to provide clear instructions for corrective action and guidelines for the future handling of similar matters.

97) Such actions were not only within the scope of authority of COL Appleby, they were demonstrably necessary actions, based on continuing command climate, leadership and administrative problems in the battalion (in addition to the two separate Army Regulation 15-6 investigations, both of which had been reviewed for legal sufficiency), to ensure the fair treatment of all subordinates and the effective management of all Active Guard Reserve personnel generally.

98) At the time of the Army Regulation 15-6 investigations and the issuance of the letters of concern, there was no evidence that SSG Shrout or other soldiers had engaged in unlawful conduct.

99) The Army Regulation 15-6 investigations determined that neither SSG Shrout nor other soldiers forged supply room documents.

100) Both investigations did produce evidence that officers had made false official statements in regard to the allegations of unlawful conduct against SSG Shrout.

101) The investigations themselves, and their reviews by senior officials, led to COL Appleby=s issuance of the LOCs and to the adverse actions against the officers, not the accusations of unlawful conduct made against SSG Shrout.

102) On October 16, 2000, COL Appleby received an e-mail from his Deputy Commander containing a request by CPT Ward for a commander=s inquiry regarding his relief from command, a related Officer Efficiency Report (AOER@), and a missing OER.

103) To ensure a fair and unbiased review of all actions taken by LTC Bacon against CPT Ward and the other officers, on November 3, 2000 COL Appleby forwarded the complete package to BG Jim Watson, Assistant Adjutant General, FLARNG, for his review.

104) BG Watson then instructed his SJA, COL Henry T. Swann, III, to conduct an independent review of the adverse actions taken by LTC Bacon.

105) On December 4, 2000, BG Watson provided COL Appleby with a copy of COL Swann=s legal review.

106) COL Swann concluded that Aample evidence exists to justify the adverse action. ...The action [LTC Bacon] chose is supported by the Findings and Recommendations of the various AR 15-6 investigations.@

107) The review concluded that A[t]he Bde Cdr [COL Appleby] was well within his discretion to take the action he took against these three officers.@

108) BG Watson concurred with all actions taken against the officers.

## V.  LEGAL CLAIMS[1]

### Count I

### The DAIG Lacked Legal Authority to Investigate the Military Whistleblower Protection Act Complaint Filed Against Plaintiff

109) The Military Whistleblower Protection Act, 10 U.S.C. § 1034, ¶(b)(1)(b), provides that "no person may take (or threaten to take) an unfavorable personnel action, or withhold (or threaten to withhold) a favorable personnel action, as a reprisal against a member of the armed forces for making or preparing" a communication that a servicemember reasonably believes constitutes evidence of "a violation of a law or regulation, including a law or regulation prohibiting sexual harassment or unlawful discrimination." (Emphasis added.)

110) Members of the FLARNG are not "members of the armed services" for purposes of the Military Whistleblower Protection Act, except under specific circumstances.

111) 10 U.S.C. § 101 defines the term "armed forces" as "the Army, Navy, Air Force, Marine Corps, and Coast Guard."

---

[1] Paragraphs 1-108 are incorporated by reference into each count that follows.

112) 32 U.S.C. § 101(2), which applies to the National Guard, likewise defines "armed forces" as "the Army, Navy, Air Force, Marine Corps, and Coast Guard."

113) 32 U.S.C. § 101(3) defines the National Guard to be "the Army National Guard and the Air National Guard."

114) Except when ordered into federal service, National Guard members retain their exclusive status as members of the state militia. *See Perpich v. Department of Defense*, 496 U.S. 334, 335 (1990).

115) 10 U.S.C. § 12401 provides that "[m]embers of the Army National Guard of the United States and the Air National Guard of the United States are not in active Federal service except when ordered thereto under law."

116) At the time COL Appleby allegedly retaliated against CPT Ward for making a protected communication, neither officer was ordered into federal service.

117) Both officers were serving in their Title 32, United States Code capacity as officers of the FLARNG, a state entity.

118) 10 U.S.C. § 1034 is not applicable to members of the Florida Army National Guard who are not in federal duty or training status.

119) The United States General Accounting Office ("GAO") concluded, consistent with the above provisions, that:

> "[f]ederal protections for National Guard whistleblowers are limited by the dual federal-state status of the guard. Federal protections apply only to guard members who are in federal duty or training statuses.... Federal protections do not apply to guard members who are in state active duty status; their protections, if any, derive from state law." (Emphasis added.)

120) The DAIG, a component of the United States Army, a federal entity, had no basis in law for accepting or investigating the whistleblower complaint made against COL Appleby.

121) COL Appleby's name was unlawfully withheld from the list of officers submitted to the Senate for confirmation and promotion to Brigadier General.

122) COL Appleby specifically raised this issue in his ABCMR application.

123) The ABCMR has "an abiding moral sanction to determine, insofar as possible, the true nature of an alleged injustice and to take steps to grant thorough and fitting relief." *Yee v. United States*, 512 F.2d 1383, 1387-88 (Ct. Cl. 1975) (citations omitted).

124) Where the ABCMR fails to consider non-frivolous claims advanced by an applicant, its decision is arbitrary. *Calloway v. Brownlee*, 366 F. Supp. 2d 43 (D.D.C. 2005)

125) The ABCMR did not specifically address this allegation in its Decision Memorandum.

126) By so acting, the ABCMR failed to perform its duties under 10 U.S.C. § 1552 and 32 C.F.R. § 581.3(b)(4).

127) The ABCMR's decision was contrary to law, arbitrary, capricious, and unsupported by substantial evidence.

### Count II

### The DAIG Lacked Jurisdiction Over the Whistleblower Complaint

128) Army Regulation 20-1, Chapter 6-6(i), provides that "the IG, DOD is required to investigate allegations of individuals taking (or threatening to take) unfavorable personnel actions or withholding (or threatening to withhold) favorable personnel actions as reprisal against a member of the Armed Forces for communicating with an MC [Member of Congress] or a member

of an audit, inspection, investigation  or law enforcement organization within DOD." (Emphasis added.)

129) Paragraph 6-6(i)(1) further provides that when such complaints are made "within 60 days of learning of the reprisal, military whistleblower legislation applies." (Emphasis added.)

130) The DAIG Report of Investigation ("ROI") states that "[o]n 28 September 2000, the Department of the Army Inspector General Agency (DAIG) received a memorandum from the IG, FLARNG, dated 28 September 2000, referring a Title 10, United States Code (USC) Section 1034 complaint (Military Whistleblower Protection)."

131) The alleged reprisal that provided the basis for the DAIG complaint took place on January 26, 2000, when the complainant, CPT Ward, was removed from his command for cause.

132) CPT Ward did not file a "whistleblower" complaint as defined by 10 U.S.C. § 1034 and Army Regulation  20-1.

133) CPT Ward did not make a protected communication to a Member of Congress, or a member of an audit, inspection, investigation or law enforcement organization within DOD.

134) On June 2, 2000, five months after his relief from command, CPT Ward contacted a civilian law enforcement organization of the State of Florida regarding concerns over illegal rentals of DOD property by an NCO.

135) CPT Ward had been relieved of his command and resigned his commission well prior to his communications with Florida law enforcement personnel.

136) CPT Ward did not file his complaint with the DAIG until September 28, 2000, just before COL Appleby's promotion to Brigadier General.

137) CPT Ward waited nearly nine months before filing his complaint.

138) The original complaint did not require DAIG investigation, and the protections afforded by 10 U.S.C. § 1034 were not applicable.

139) COL Appleby's name therefore was unlawfully withheld from the list of officers submitted to the Senate for confirmation and promotion to Brigadier General.

140) COL Appleby specifically raised this issue in his application to the ABCMR.

141) The ABCMR has "an abiding moral sanction to determine, insofar as possible, the true nature of an alleged injustice and to take steps to grant thorough and fitting relief." *Yee v. United States*, 512 F.2d 1383, 1387-88 (Ct. Cl. 1975) (citations omitted).

142) Where the ABCMR fails to consider non-frivolous claims advanced by an applicant, its decision is arbitrary. *Calloway v. Brownlee*, 366 F. Supp. 2d 43 (D.D.C. 2005).

143) The ABCMR did not specifically address this allegation in its Discussion and Conclusions.

144) By so acting, the ABCMR failed to perform its duties under 10 U.S.C. § 1552 and 32 C.F.R. § 581.3(b)(4).

145) The ABCMR's decision was contrary to law, arbitrary, capricious, and unsupported by substantial evidence.

### *Count III*

### The DAIG Lacked Jurisdiction Over the Whistleblower Complaint<br>Because CPT Ward Failed to Exhaust Available Remedies

146) Army Regulation 20-1 of 15 March 1994, Paragraph 6-7(a), provides that "there are many situations for which law or regulation provide soldiers a remedy or means of redress. Soldiers must seek the remedy or redress before an IG can provide assistance. Once the soldier has

used the available redress procedures, <u>IG assistance is limited to a review of the situation to determine if the soldier was afforded due process provided by law or regulation</u>." (Emphasis added.)

147) The Uniform Code of Military Justice, Army regulations, and federal statute afford a soldier who perceives himself to be aggrieved by the actions of a superior officer several possible courses of conduct that may remedy his situation.

148) Such courses of conduct include: Article 138 complaints for the redress of wrongs by a commanding officer under 10 U.S.C. § 938 ("Article 138"); (AR 27-10); a request for investigation under Army Regulation 15-6; and petitions to the ABCMR for the correction of military records.

149) Here, CPT Ward utilized only one of the available procedures, a command investigation, for resolving his grievance.

150) The Command Investigation, conducted by COL Appleby's superior officer, BG Jim Watson, upheld the actions taken by COL Appleby and his subordinates.

151) He did so only after filing the whistleblower complaint against COL Appleby.

152) In addition to a commander's investigation, at least two additional means of redress were available to CPT Ward: 1) a complaint under Article 138 of the UCMJ; and 2) application to the ABCMR.

153) Article 138 of the UCMJ permits a soldier to challenge a commanding officer's actions where the soldier believes he has been aggrieved by those actions.

154) Under Article 138, the officer is first required to make an informal complaint requesting specific relief or redress.

155) If the commanding officer denies the relief or redress requested, the affected officer then may make a formal complaint to any commissioned officer, who is obliged to bring the complaint before a General Court Martial Convening Authority officer. That officer then is required to investigate and determine the merits of the complaint, and report his or her findings to the Secretary of the Army.

156) CPT Ward believed he had been unlawfully relieved of his command. Such action was appropriate subject matter for an Article 138 complaint.

157) CPT Ward also could have challenged his relief from command by making an application to the ABCMR.

158) CPT Ward did not avail himself of these remedies, however, and therefore the DAIG had no authority to conduct its investigation under AR 20-1.

159) AR 20-1 provides that where a soldier does pursue available means of redress as required, subsequent DAIG action is limited to assuring that the soldier's due process rights were respected in those procedures.

160) The only legitimate authority the DAIG had in this case was to consider whether or not the commander's inquiry was conducted in a manner that respected the due process rights afforded CPT Ward.

161) Because CPT Ward failed to utilize command based procedures for resolving his grievances, the DAIG had no authority to conduct its investigation.

162) COL Appleby's name therefore was unlawfully withheld from the list of officers submitted to the Senate for confirmation and promotion to Brigadier General.

163) COL Appleby specifically raised this issue in his application to the ABCMR.

164) The ABCMR has "an abiding moral sanction to determine, insofar as possible, the true nature of an alleged injustice and to take steps to grant thorough and fitting relief." *Yee v. United States*, 512 F.2d 1383, 1387-88 (Ct. Cl. 1975) (citations omitted).

165) Where the ABCMR fails to consider non-frivolous claims advanced by an applicant, its decision is arbitrary. *Calloway v. Brownlee*, 366 F. Supp. 2d 43 (D.D.C. 2005).

166) The ABCMR did not specifically address this allegation in its Discussion and Conclusions.

167) By so acting, the ABCMR failed to perform its duties under 10 U.S.C. § 1552 and 32 C.F.R. § 581.3(b)(4).

168) The ABCMR's decision was contrary to law, arbitrary, capricious, and unsupported by substantial evidence.

### Count IV

### The Army Had no Legal Basis Under 10 U.S.C. § 14311 or Army Regulation 600-8-29 For Delaying Col Appleby's Promotion

169) 10 U.S.C. § 14311, paragraph (a)(1)-(c) provides that "the appointment of an officer to a higher grade may be delayed if … an investigation is being conducted to determine whether disciplinary action of any kind should be brought against the officer." (Emphasis added.)

170) Army Regulation 600-8-29, Paragraph implements this provision, and provides that an officer is in a non-promotable status where he or she is "[u]nder investigation that may result in disciplinary action of any kind being taken against him or her."

21

171) Central to the meaning and effect of these provisions is the term "investigation." 10 U.S.C. § 14311 does not define the term "investigation," though AR 20-1 does. There, an IG Investigation is defined as:

> [a] fact-finding investigation by a detailed IG into allegations, issues, or adverse conditions, to provide the directing authority a sound basis for decision and actions. Inspector general investigations normally involve allegations of wrongdoing by an individual <u>and are authorized by written directives</u>. (Emphasis added.)

172) In this case, COL Appleby's promotion was delayed on or around October 3, 2000.

173) The delay resulted from an anonymous "whistleblower" complaint filed with the FLARNG IG on or around September 28, 2000.

174) The FLARNG forwarded the complaint to the DAIG on September 28, 2000.

175) On January 31, 2001, the DAIG obtained a Directive for Investigation from General Keane, formally commencing its investigation into the allegations against COL Appleby.

176) That was the first directive for investigation, issued some 120 days after the Army withheld COL Appleby's name from the promotion list sent to the Senate for confirmation in early October 2000.

177) Army Regulation 20-1, "Inspector General Activities and Procedures," outlines the process for handling an anonymous IG complaint such as that made against COL Appleby.

178) According to Chapter 4, Paragraph 4-1, "Inspectors general will use the Inspector General Action Process (IGAP) outlined below in receiving and resolving IGARs [Inspector General Action Requests]."

179) Paragraph 4-2(g)(4) provides that where the complaint is received through the Department of Defense Inspector General ("DODIG") Hotline, as occurred here, "[t]he coordinator refers DOD Hotline cases to field IG offices for appropriate action and reply...."

180) Once the proper IG office has received the complaint, the Inspector General Preliminary Analysis ("IGPA") process is employed to determine the correct disposition of the case.

181) Paragraph 4-3(c) provides that "[a]n IG is usually in IGPA until a course of action is selected for a particular issue or allegation, but in the course of obtaining facts, additional issues may result in further IGPA concurrent with other IGPA procedures pertaining to the original IGAR." (Emphasis added.)

182) During the IGPA, the IG is directed to identify allegations and issues and determine the appropriateness of the complaint for IG action.

183) Once the analysis is completed, and the IG determines that a formal IG investigation is warranted, the IG must then obtain a directive for investigation from the Vice Chief of Staff.

184) If the IG determines that an Investigative Inquiry is sufficient to address the matter, no Directive for Investigation is required.

185) Army Regulation 20-1 of 15 March 1994, Glossary, Section I, defines an Investigative Inquiry as "[a]n informal fact finding process by IGs to gather information needed to respond to a requester (assistance function), or resolve allegations or issues when investigative techniques are appropriate (investigative function), but circumstances do not merit conduct of an IG investigation."

186) In this case, the DAIG ultimately determined that an IG investigation was required, and sought and obtained a Directive for Investigation.

187) As noted, on January 31, 2001, General Keane issued the Directive for investigation, formally initiating investigative action against COL Appleby.

187) AR 20-1 does not define IGPA as an investigative action that may lead to disciplinary action being taken against an officer. It makes clear that this stage of analysis and processing is preliminary in nature, through which a course of action, that may or may not involve an investigation, will be decided upon.

188) In this instance, the DAIG eventually decided upon an IG investigation after completion of the IGPA process.

189) In October, 2000, COL Appleby was not the subject of an investigation to determine whether disciplinary action of any kind should be brought against him at the time his promotion was delayed.

190) The Army therefore had no basis in law for delaying his promotion under 10 U.S.C. § 14311.

191) The mere receipt of a complaint by the DAIG and the subsequent IGPA process do not constitute, by AR 20-1's own definitions, investigative action.

192) COL Appleby's name therefore was unlawfully withheld from the list of officers submitted to the Senate for confirmation and promotion to Brigadier General.

193) COL Appleby specifically raised this issue in his application to the ABCMR.

194) The ABCMR has "an abiding moral sanction to determine, insofar as possible, the true nature of an alleged injustice and to take steps to grant thorough and fitting relief." *Yee v. United States*, 512 F.2d 1383, 1387-88 (Ct. Cl. 1975) (citations omitted).

195) Where the ABCMR fails to consider non-frivolous claims advanced by an applicant, its decision is arbitrary. *Calloway v. Brownlee*, 366 F. Supp. 2d 43 (D.D.C. 2005).

196) The ABCMR did not specifically address this allegation in its Discussion and Conclusions.

197) By so acting, the ABCMR failed to perform its duties under 10 U.S.C. § 1552 and 32 C.F.R. § 581.3(b)(4).

198) The ABCMR's decision was contrary to law, arbitrary, capricious, unsupported by substantial evidence, and in bad faith.

### Count V

**The Army Violated 10 U.S.C. § 14311 And AR 600-8-29 By Failing To Notify Col Appleby In Writing Of Its Decision To Delay His Promotion And Provide Him An Opportunity To Respond In Writing To The Secretary Of The Army.**

199) 10 U.S.C. § 14311, paragraph (c)(1) provides that "[t]he appointment of an officer to a higher grade may not be delayed under subsection (a) or (b) unless the officer is given written notice of the grounds for the delay." Paragraph (c)(2) further provides that "[a]n officer whose promotion is delayed under subsection (a) or (b) shall be given an opportunity to make a written statement to the Secretary of the military department concerned in response to the action taken. The Secretary shall give consideration to any such statement."

200) Army Regulation 600-8-29, paragraph 1-20, is responsive to the Congressional requirements of 10 U.S.C. § 14311, and provides that "[t]he office preparing the DA [Department of the Army] Form 268 [Report to Suspend Favorable Personnel Actions (Flag)] must give that officer written notice of the reason for the delay of promotion before its imposition or as soon thereafter as possible…. An officer whose promotion has been delayed

may make a written statement, expeditiously forwarded through the chain of command, to the Secretary of the Army…."

201) These provisions give the affected officer advance notice of the impending delay in promotion and an opportunity to make representations as to why such action is unwarranted or otherwise inappropriate.

202) These provisions create an important procedural safeguard to prevent the surreptitious or otherwise unjustifiable delay of an officer's promotion, as occurred here.

203) The Army violated 10 U.S.C. § 14311 and Army Regulation 600-8-29 by failing to notify COL Appleby in writing of the grounds for the delay and afford him an opportunity to respond.

204) The ABCMR has "an abiding moral sanction to determine, insofar as possible, the true nature of an alleged injustice and to take steps to grant thorough and fitting relief." *Yee v. United States*, 512 F.2d 1383, 1387-88 (Ct. Cl. 1975) (citations omitted).

205) The ABCMR rejected COL Appleby's claim, stating, "[t]he evidence surrounding the applicant's notification of removal from the confirmation list, or the lack thereof, is not present in the available evidence; however, the applicant acknowledges that he was notified telephonically by senior officials. While the lack of written notification is not condoned, there was no evidence submitted by applicant with this application to support that contention or evidence of harm that resulted from his telephonic notification vice written notification."

206) COL Appleby identified in his application to the ABCMR the prejudice to him resulting from the Army's unlawful conduct.

207) COL Appleby's name therefore was unlawfully withheld from the list of officers submitted to the Senate for confirmation and promotion to Brigadier General.

208) COL Appleby specifically raised this issue in his application to the ABCMR.

209) The ABCMR failed to perform its duties under 10 U.S.C. § 1552 and 32 C.F.R. § 581.3(b)(4).

210) The ABCMR's decision was contrary to law, arbitrary, capricious, and unsupported by substantial evidence.

### *Count VI*

### The Army Violated 10 U.S.C. § 14311 and AR 600-8-29 by Failing to Obtain Secretary of the Army Approval for Delaying COL Appleby's Promotion Beyond the Authorized Six Month Period.

211) 10 U.S.C. § 14311(d) provides that "[t]he appointment of an officer to a higher grade may not be delayed...for more than six months after the date on which the officer otherwise would have been promoted unless the Secretary concerned specifies a further period of delay. ...Except for court action, a promotion may not be delayed more than 18 months after the date on which the officer would otherwise have been promoted."

212) Army Regulation 600-8-29, Paragraph 1-20(b) similarly provides that "[a]n officer's promotion will not be delayed more than 6 months unless the SA or the Secretary's designee grants a further delay."

213) COL Appleby was selected for promotion to Brigadier General in December, 1999.

214) His name was submitted to the Senate for confirmation in early October, 2000. COL Appleby's promotion was scheduled to be effected in early October, 2000.

215) His promotion was delayed on or around October 3, 2000. The initial 6-month delay therefore expired on or around April 3, 2001.

216) The Secretary of the Army did not authorize an additional delay beyond the initial 6-month period authorized by 10 U.S.C. § 14311.

217) COL Appleby was never informed, orally or in writing, of any such action.

218) COL Appleby's name, therefore, was unlawfully withheld from the list of officers submitted to the Senate for confirmation and promotion to Brigadier General.

219) COL Appleby specifically raised this issue in his application to the ABCMR.

220) The ABCMR has "an abiding moral sanction to determine, insofar as possible, the true nature of an alleged injustice and to take steps to grant thorough and fitting relief." *Yee v. United States*, 512 F.2d 1383, 1387-88 (Ct. Cl. 1975) (citations omitted).

221) Where the ABCMR fails to consider non-frivolous claims advanced by an applicant, its decision is arbitrary. *Calloway v. Brownlee*, 366 F. Supp. 2d 43 (D.D.C. 2005).

222) The ABCMR did not specifically address this allegation in its Discussion and Conclusions.

223) By so acting, the ABCMR failed to perform its duties under 10 U.S.C. § 1552 and 32 C.F.R. § 581.3(b)(4).

224) The ABCMR's decision was contrary to law, arbitrary, capricious, unsupported by substantial evidence, and in bad faith.

### Count VII

**The DAIG Erroneously Concluded that the Letters of Concern Issued by COL Appleby Were "Letters of Reprimand" and Constituted Threats Against the Affected Officers.**

225) Army Regulation 600-37 governs the use of "Unfavorable Information" pertaining to the character, integrity, trustworthiness, or reliability of military soldiers.

226) This regulation permits the filing of unfavorable information in a soldier's OMPF or Military Personnel Record Jacket ("MPRJ") under specified conditions.

227) Such action is considered to be adverse personnel action and as such demands that certain procedural rights be afforded the affected soldier.

228) AR 600-37, Paragraph 3-4, addresses letters of reprimand, admonition, and censure. Where a commander does not file such unfavorable information in a soldier's OMPF or MPRJ, no specific procedural protections are afforded the soldier, as no adverse personnel action is considered taken.

229) COL Appleby issued LOCs against two officers for substandard leadership and management, based on two separate AR 15-6 investigations that had been reviewed carefully for legal sufficiency.

230) COL Appleby did not direct the filing of the LOCs in the officers' official personnel records; he specifically directed that they not be filed in the officers' official personnel records.

231) COL Appleby did not take adverse action against the officers.

232) The LOCs provided the sole basis for the DAIG's conclusion that COL Appleby reprised against officers for making protected communications.

233) The DAIG's use of the term "Letter of Reprimand" was factually inaccurate.

234) The foundation for the DAIG's conclusion that the letters constituted LORs was based on its reading of the text of the letters themselves. The DAIG noted that COL Appleby stated in his LOC to MAJ Hulen that:

> [w]hile this is not an official letter of reprimand, it is, in fact, a reprimand of you as an officer of the United States Army and the FLARNG. I can assure you that any further activities, particularly those that raise questions about your integrity or personnel management skills, and which I perceive to be in violation of this letter or a continuance of your previous conduct shall result in further swift and appropriate action by this CDR.

235) The DAIG further noted that in his LOC to LTC Bacon, COL Appleby similarly stated that "[t]his letter is not intended as an official letter of reprimand. A copy will not be included in your personnel file unless you continue to improperly supervise your staff and they

do not follow proper leadership standards." (Emphasis added.)

236) The DAIG concluded in both instances that the LOCs constituted the communication of a threat, in retaliation for making protected communications.

237) As regards the LOC to MAJ Hulen, the DAIG noted that "[t]he processing of the letter was procedurally correct; however, it was considered unfair and unreasonable."

238) The DAIG concluded in regard to LTC Bacon's LOC that "[t]he word 'unless' established that the letter had the potential filing as an official LOR. The processing of the letter was procedurally incorrect."

239) The DAIG admitted that the letters "debatably might not meet the LOR ["Letter of Reprimand"] standards of Army Regulation 600-37, however, COL Appleby did state it was a reprimand."

240) COL Appleby's name, therefore, was unlawfully withheld from the list of officers submitted to the Senate for confirmation and promotion to Brigadier General.

241) COL Appleby specifically raised this issue in his application to the ABCMR.

242) The ABCMR has "an abiding moral sanction to determine, insofar as possible, the true nature of an alleged injustice and to take steps to grant thorough and fitting relief." *Yee v. United States*, 512 F.2d 1383, 1387-88 (Ct. Cl. 1975) (citations omitted).

243) Where the ABCMR fails to consider non-frivolous claims advanced by an applicant, its decision is arbitrary. *Calloway v. Brownlee*, 366 F. Supp. 2d 43 (D.D.C. 2005).

244) The ABCMR did not specifically address this allegation in its Discussion and Conclusions.

245) By so acting, the ABCMR failed to perform its duties under 10 U.S.C. § 1552 and 32 C.F.R. § 581.3(b)(4).

246) The ABCMR's decision was contrary to law, arbitrary, capricious, unsupported by substantial evidence, and in bad faith.

### Count VIII

**Violation of Right to Due Process of Law: Failure to Provide
Timely Notice of and an Opportunity to Respond to Adverse Information**

247) Army Regulation 20-1, Paragraph 7-6, establishes the policy that an individual who is the subject of investigation shall be afforded an opportunity to comment on any unfavorable information generated as a result of the investigation.

248) Paragraph 7-6 provides that "[i]f the individual <u>was not informed of the unfavorable information during the IG investigation, the IG will advise the person concerned, orally or in writing, of its substance before the IG investigation is completed</u>." (Emphasis added.)  This provision subsequently was clarified to provide that "[t]he individual has the right to know of the unfavorable information during the IG inquiry or investigation." Army Regulation 20-1 of 29 March 2002.

249) The "Inquiries and Investigations Guide," Chapter II, Paragraph 2(a)1, provides that:

> individuals about whom you have developed unfavorable information and will include that information in your report, have the right to know the information and the right to have the opportunity to comment on it should they so desire. (Emphasis added.)

250) COL Appleby was denied his procedural right of notice and response. He was never informed by the DAIG, orally or in writing, of the specifics of the allegations against him at any time during the investigation.

251) COL Appleby first learned of the allegations against him during his first interview with the DAIG, which was conducted on March 14, 2001 (five months after he was removed

from the promotion list), and then only in a cursory manner.

252) The investigator advised COL Appleby that:

> you are suspected of the following allegations which we want to question you about: That you improperly relieved an officer; that you improperly processed Officer Evaluation Reports; and that you reprised against an Officer for making a protected communication.

253) The investigator questioned COL Appleby in great detail for approximately three hours about the allegations at issue. The transcript for this interview totaled 78 type-written pages.

254) The investigator conducted a second interview with COL Appleby on May 21, 2001. That interview lasted some five hours and required an additional 91 pages of typed transcript.

255) At the May 21, 2001 interview, the investigator advised COL Appleby of the allegations against him in the same manner as he did during the March 14, 2001 interview.

256) The DAIG did not provide any details of the particular actions forming the bases of the allegations against COL Appleby.

257) At no time prior to or during the two interviews did the DAIG apprise COL Appleby of the specific actions that formed the basis of the allegations against him.

258) COL Appleby requested a copy of the DAIG ROI on July 9, 2001.

259) By memorandum dated August 21, 2001, the Army provided COL Appleby with a highly redacted copy of the ROI, 21 days after he was involuntarily retired on July 31, 2001.

260) COL Appleby specifically raised this issue in his application to the ABCMR.

261) The ABCMR has "an abiding moral sanction to determine, insofar as possible, the true nature of an alleged injustice and to take steps to grant thorough and fitting relief." *Yee v. United States*, 512 F.2d 1383, 1387-88 (Ct. Cl. 1975) (citations omitted).

262) Where the ABCMR fails to consider non-frivolous claims advanced by an applicant, its decision is arbitrary. *Calloway v. Brownlee*, 366 F. Supp. 2d 43 (D.D.C. 2005).

263) The ABCMR did not specifically address this allegation in its Discussion and Conclusions.

264) By so acting, the ABCMR failed to perform its duties under 10 U.S.C. § 1552 and 32 C.F.R. § 581.3(b)(4).

265) The ABCMR's decision was contrary to law, arbitrary, capricious, unsupported by substantial evidence, and in bad faith.

### Count IX

### COL Appleby's Involuntary Retirement Was Unlawful.

266) 10 U.S.C. § 14507(b) provides as follows: "Colonels and Navy captains. Unless continued on the reserve active-status list under section 14701 or 14702 of this title …or retained as provided in section 12646 or 12686 of this title …, each reserve officer of the Army, Air Force, or Marine Corps who holds the grade of colonel, and each reserve officer of the Navy who holds the grade of captain, and who is not on a list of officers recommended for promotion to the next higher grade shall … be removed from that list under section 14514 of this title … on the first day of the month after the month in which the officer completes 30 years of commissioned service. This subsection does not apply to the adjutant general or assistant adjutants general of a State." (Emphasis added.)

267) Because COL Appleby was never in a non-promotable status, his removal from the Brigadier General Promotion List was unlawful.

268) Because COL Appleby's name was unlawfully removed from the Brigadier General Promotion List, his subsequent involuntary retirement was unlawful.

269) The ABCMR's determination that COL Appleby was properly retired due to maximum years of service was arbitrary, capricious, contrary to law, and unsupported by substantial evidence.

## VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court grant him the following relief:

(1)  Order the Secretary of the Army to expunge from Plaintiff's military record all documents referencing the DAIG investigation and the ROI;

(2)  Order the Secretary of the Army to expunge from Plaintiff's record all documents pertaining to his withholding from the Brigadier General Promotion List;

(3)  Direct that the Army restore COL Appleby's name to the Brigadier General Promotion List;

(4)  Award Plaintiff costs expended in pursuit of this action; and

(5)  Award Plaintiff attorney fees in accordance with the Equal Access to Justice Act.

Respectfully submitted,

/s/  Grant Lattin_____
Grant Lattin  (D.C. Bar No. 436051)
Attorney at Law
11970 Shorewood Court
Woodbridge, VA 22192
Email:  GrantLattin@aol.com
Tel: 703-490-0000
Fax: 703-497-7249

Raymond J. Toney
The Law Office of Raymond J. Toney
34-16 30th Avenue, Third Floor
Astoria, NY 11103
Tel: 718-726-3656
Fax: 661-459-0476

*Attorneys for Plaintiff*