# ENCLOSURE 1



**DEPARTMENT OF THE ARMY**
BOARD FOR CORRECTION OF MILITARY RECORDS
1901 SOUTH BELL STREET 2ND FLOOR
ARLINGTON, VA 22202-4508

## RECORD OF PROCEEDINGS

IN THE CASE OF:     APPLEBY, CHARLES C.

BOARD DATE:        26 July 2007
DOCKET NUMBER:  AR20070008429

I certify that hereinafter is recorded the true and complete record of the proceedings of the Army Board for Correction of Military Records in the case of the above-named individual.

| | |
|---|---|
| Ms. Catherine C. Mitrano | Director |
| Mrs. Nancy L. Amos | Analyst |

The following members, a quorum, were present:

| | |
|---|---|
| Ms. Linda D. Simmons | Chairperson |
| Mr. Jerome L. Pionk | Member |
| Mr. John G. Heck | Member |

The Board considered the following evidence:

Exhibit A - Application for correction of military records.

Exhibit B - Military Personnel Records (including advisory opinion, if any).

ABCMR Record of Proceedings (cont)                    AR20070008429

THE APPLICANT'S REQUEST, STATEMENT, AND EVIDENCE:

1.  The applicant requests, through a court remand, reconsideration of his request to promote him to the rank of brigadier general (BG); to remove a letter of concern from his Official Military Personnel File, and to show he retired in the rank of BG with all due back pay and allowances or, in the alternative, that he be reinstated in the Florida Army National Guard (FLANG) in the rank of BG.

2.  The U. S. District Court for the District of Columbia, in an Amended Order, noted the applicant had filed nine counts of legal claims alleging, in effect, that the Army improperly withheld his promotion to BG.  The Court awarded summary judgment to the Army on Counts IV, V, VI, VII, and IX of his Complaint.  The Court denied the applicant's cross-motion for summary judgment with respect to Counts I through VII and IX.

3.  The Court dismissed the Army's motion to dismiss Count VIII of the Complaint without prejudice pending review of the allegations asserted in Count VIII by the Secretary of the Army (i.e., the Army Board for Correction of Military Records (ABCMR)).

4.  The Court noted Count VIII of the Complaint alleged that the applicant's right to due process was violated because "he was never informed by the DAIG (Department of the Army Inspector General) orally or in writing, of the specifics of the allegations against him at any time during the investigation." The applicant contended that when he first learned of the allegations against him on 14 March 2001, it was in a "cursory manner."  The applicant contended that, although he was interviewed and questioned thereafter in great detail on two occasions during the investigation, "[a]t no time during the two interviews did the DAIG apprise [him] of the specific allegations that formed the basis of the allegations against him."

5.  The Court noted there was no question that the applicant was advised of the charges against him.  However, the applicant maintained that the notice he received did not provide any details of the particular actions forming the bases of the allegations.  Specifically, he acknowledged that on 14 March 2001, during an interview conducted by an investigator, he was informed that he was "suspected of the following allegations which [they] want[ed] to question [him] about:  That [he] improperly relieved an officer; that [he] improperly processed Officer Evaluation Reports; and, that [he] reprised against an Officer for making a protected communication."

2

ABCMR Record of Proceedings (cont)                    AR20070008429

6. The Court noted the applicant was again informed, on 21 May 2001, during the course of the investigation "of the allegations against him in the same manner as he [was] during the March 14, 2001 interview." Nonetheless, the applicant insisted that "[t]he DAIG did not provide any details of the particular actions forming the bases of the allegations against [him]."

7. The Court noted that, according to the applicant, a 78-page typewritten report was produced from the March interview and an additional 91-page typewritten report was produced as a result of the May interview. Yet the Army did not include those reports in the administrative record, nor did the [ABCMR] address the applicant's inadequate notice argument. Thus, it was difficult for the Court to discern whether the applicant was adequately advised of the allegations against him.

8. The Court ruled that, because it appeared the applicant raised his inadequacy notice argument with the ABCMR, and the argument was not frivolous on its face, the ABCMR's failure to address the argument was arbitrary. The Court remanded the case to the Secretary of the Army to address this argument.

CONSIDERATION OF EVIDENCE:

1. Incorporated herein by reference are military records which were summarized in the previous consideration of the applicant's case by the ABCMR in Docket Number AR2004105941 on 11 August 2005.

2. After having had prior commissioned service in the Active Army and in the U. S. Army Reserve (USAR), the applicant accepted an appointment as a major in the FLARNG on 31 October 1987. He was promoted to colonel (COL), O-6 on 6 March 1996.

3. In March 1999, the applicant was selected by The Adjutant General (TAG) of the Florida National Guard (FNG) to assume command of an FNG Major Command and to serve simultaneously as the Deputy Commanding General (DCG) of the 32d Army Air and Missile Defense Command (AAMDC), an active duty Army Headquarters. On 27 July 2000, his selection for promotion to the rank of BG was announced by the Secretary of Defense and was submitted by the President to the Senate for confirmation on 13 September 2000.

4. On 28 September 2000, the DAIG received a memorandum from the IG, FLARNG referring a Title 10, U. S. Code, section 1034 complaint (Military

3

ABCMR Record of Proceedings (cont)                AR20070008429

Whistleblower Protection) in which the applicant was accused of taking
reprisal actions against a subordinate for making protected disclosures to
his chain of command regarding criminal activities.

5.  On 3 October 2000, the applicant was notified telephonically by the FNG
TAG that he was being removed from the general officer promotion list at
the request of the DAIG based on a complaint having been filed against
him.

6.  On 6 October 2000, the applicant was notified telephonically by the
Deputy DAIG that a reprisal complaint had been filed against him only hours
before his promotion was to be confirmed and that, based on the complaint,
his name was withheld by the Army from the list of officers whose
promotions were confirmed by the Senate in October 2000.

7.  On 16 January 2001, the FNG TAG again contacted the applicant and
informed him that the allegation of reprisal against the complainant had
been unsubstantiated.  However, other issues had arisen out of the
investigation that required the authority of the Vice Chief of Staff of the Army
(VCSA) to investigate further.  On 31 January 2001, the VCSA directed that
the DAIG investigate alleged improprieties by senior officials assigned to the
32d AAMDC, FLARNG.

8.  On 14 March 2001, the applicant was interviewed by Lieutenant Colonel
(LTC) T___ and COL S___ of the DAIG.  "Q" are questions from LTC T___
or COL S___; "A" are answers by the applicant to those questions.  (The
below quotations from two DAIG interviews with the applicant are taken
verbatim from the typewritten reports of the interviews with spelling,
grammatical, and punctuation errors intact.)  On page 1 of the 78-page
typewritten report of this interview, LTC T___ informed the applicant:

> "You're advised that you are suspected of the following
> allegations which we want to question you about:  That you
> improperly relieved an Officer; that you improperly processed
> Officer Evaluation Reports; and that you reprised against an
> Officer for making a protected communication."

> (page 9)  Q.  "And 5 June of '99 when you assumed the
> Commander's position, uh, did the rating chain stay the same
> or did it change?"

> (page 9 and 10)  A.  "Eh, my best recollection is it changed.
> Eh, I frankly did not agree with my predecessor General N___.

4

ABCMR Record of Proceedings (cont)                AR20070008429

Eh, he had me [as the DCG] rating Battalion Commanders –
uh, and senior rate the Battery Commanders. I honestly felt
like that Commanders should rate the Battalion Commanders,
not the Deputy Commander."

(page 10) Q. Commander-to Commander relationship?" A.
"…when I assumed command I felt like it was appropriate for
me to continue to rate – not to continue, to rate the Battalion
Commanders as their Commander. Eh, and I took that
responsibility away from the Deputy position. However, we did
keep the senior rating of the Battery Commanders with the
Deputy position just to keep some of the workload off of me."

(page 25) Q. "So on 5 June when you assumed command,
uh, anybody that you would have rated or senior rated at that
time as the Deputy that would have changed with respect to
the Battery Commanders. Is that correct?" A. "That's
correct." Q. Okay. Can you explain…Annual Evaluation
Report for Captain W___. Eh, it starts 1 October of 1998 and
ends 30 September of '99." A. "Uh-huh."

(page 26) Q. "The regulation for senior rater requires that the
senior rater be in the duty position 60 days. This appears to
be over 90 days. Can you tell me why you would have elected
or would have senior rated instead of Colonel T___ on this
report?" A. "…in October of 2000 is when I received that OER
to complete… that will produce a substantial confusion…." Q.
"For the record this one is dated—uh, by the rater on
1 October '99 and you finished it according to the dates here
your portion as the senior rater 1 November of '99…I
understand what you just indicated." A. "Yes." Q. "So this
report was not prepared until a year, over a year after it was
actually due?" A. "That's correct."

(page 27) Q. "And from what we can see [you] should have
ceased being the senior rater back in June of '99, uh, realize
the Annual was through 30 September but it was for whatever
reason not processed for another year. How did – I still don't
understand and I am a little confused as to how we didn't get
the senior rater right on this." A. "Well, I'm not sure the senior
rater is not right…So if I receive an OER a year later and I was
appropriately designated as the senior rater----

ABCMR Record of Proceedings (cont)                AR20070008429

(page 28) Q. "...Then all you have to be is 60-days in the
position. Well, if we take June, 5 June, and go forward
60 days, we're into August, the ending date on this one was
30 September." A. "Right." Q. "Well, after--in other words, it
was well over 90 days yet you rate. So the—for Colonel T___
he met the senior rater requirements under the Reg. And I'm
just trying to understand----" A. "Right." Q. "Then why you
would have senior rated. And especially now based on what
you've indicated. That it wasn't prepared until much later."

(page 29) Q. "As you explained, you currently are not in the
rating chain as the senior rater for the Battery Commanders?"
A. "That's correct." Q. "So based on the 5 June, that wouldn't
apply. It was Colonel T___ who met the requirement to senior
rate...."

(page 29) Q. "You're stating that the Regulation says that
because you were in command for 90-days you had [an]
obligation to write that report. That's what you stated, am I
correct?" A. "...not in command, but because I was the senior
rater for more than 90 days, I was required to do that under
the FNG Regulations. "

(page 39-40) Q. "Who was present for that meeting?" A.
"Let me explain the context of the meeting. It was somewhat
consistent with the recommendations given to me by my Staff.
Eh, as previously... stated...I was troubled by the apparent
misconduct of Officers under my command. Eh, I called
Colonel B___ and asked if he could come to my office...I told
him I had the 15-6, that I reviewed it and there was some
serious findings in the 15-6. I gave him the copy of the full 15-
6...and told him to go read the 15-6, study it, read it again, go
to lunch, come back and read it again, and come to me with
his recommendations as to what he thinks should be done.

(page 43) Q. "...What did he present to you with his views on
the 15-6 since they occurred in his Battalion?" A. "...when he
came back in...He probably had three or four hours–...to read
and digest and consider the 15-6...that he recommended that
Major H___ his Executive Officer get a Letter of Reprimand,
Lieutenant D___ be relieved, transferred and get an Article
15...He would like to relieve Captain W___ of command

6

ABCMR Record of Proceedings (cont)                AR20070008429

before the February drill and refer him to for a Courts-Martial...Under no circumstances did I direct those actions."

(page 44) Q. "What I'm trying to get at, was it reasonable for him to read that whole report in the time frame that you gave him and give you a reasonable response or did you in fact have possibly an idea as to what you expected him to say?" A. "I didn't have any idea what I expected him to say. Eh, I had an idea what I would like him to say, but I did not have any expectations of what he would say...There was no requirement that action be taken that day. I mean his decision to remove them before the February drill was his decision. I—I—uh, I did not—I did my best not to influence that...I trust my Commanders. And I expect them to do their job."
(page 46) Q. "Earlier when we talked about Staff Sergeant S___ you indicated I believe that Staff Sergeant S___ provided a rebuttal to the 15-6 and I believe you indicated it was five days as I recall late to General N___, but it was still considered." A. "It actually wasn't addressed to General N___ it was addressed to me because that time frame is when we changed command." Q. "Okay. And you reviewed it?" A. "Right." Q. "And took appropriate action or recommended appropriate action at that point, correct?" A. "Well, when I got the rebuttal what I did was—uh, appoint Major B___ to investigate the issues that were raised by Sergeant S___."

(page 48-49) Q. "If the 15-6 or any other issue was used as the basis for the relief action, we see no evidence that Captain W___ prior to the action as occurred with Staff Sergeant S___ was given the opportunity to rebut the proposed action. Is that correct or was there to your knowledge the opportunity in those 12 days between your meeting when Lieutenant Colonel B___ said this is what I am going to do, and it actually was executed. Do you have any knowledge of him being given the opportunity to rebut the relief which I believe is a pretty serious matter for a Commander to take." A. "Uh, I am not aware of what actions were or were not taken...after my meeting with Colonel B___, I had no reason to believe that he would not follow the regulations. I did not check to see what steps he had taken and to the best of my knowledge no formal actions ever came across my desk through me for the actions he took...."

7

ABCMR Record of Proceedings (cont)                AR20070008429

(page 50)  Q.  "Typically, yes, so based on…Lieutenant
Colonel B___'s comment to you here's what I am going to do,
I am going to relieve him and we're gonna do it before the
February drill which would occur in the first week or so of
February…would you have thought that that perhaps was not
enough time for Captain W___ to respond and discuss that
point with Lieutenant Colonel B___?"  A.  "It didn't cross my
mind.  Eh, the—I'm much more knowledgeable in the
procedural requirements today than I was on January the 14th
of 2000…."

(page 52)  Q.  "…The AR 15-6 was it a informal or formal?"  A.
"Uh, informal."  Q.  "And Major – or Captain W___ was not a
respondent in that matter?"  A.  "That is correct."

(page 52-53)  Q.  "Is that correct?  It goes on to say that,
"When adverse administrative action is contemplated against
an individual…" and I think we've talked through that piece
and we've agreed that the 15-6 was the basis to contemplate
relief action minimally…"Based upon information obtained as a
result of an investigation or board conducted pursuant to the
regulation, the appropriate Military authority must observe the
following minimum safeguards before taking final action
against the individual.  (a) Notify the person in writing of the
proposed adverse action…(b) Give the person a reasonable
opportunity to reply in writing and submit relevant rebuttal
material and (c) review and evaluate the person's response."
If Lieutenant Colonel B___ executed the relief, who in your
view should have reviewed the action to make sure that it was
consistent with the regulation?  What I just read."  A.  "He
should have reviewed the action?"  Q.  "Lieutenant Colonel
B___ being a Battalion Commander so I would assume
somebody in the chain above him?"

(page 60)  Q.  "…AR 600-20 says…final action to relieve an
Officer from any Command position—and Captain W___ I
believe was certainly in a Command position – will not be
taken until after written approval by the first General Officer to
include one frocked to the grade of Brigadier General in the
Chain of Command of the Officer being relieved.  Can you
explain whether that happened or why it wouldn't have
happened if that wasn't the case?"  A"…I don't think it was
very timely done…So while I think Colonel B___ intended to

8

ABCMR Record of Proceedings (cont)                    AR20070008429

relieve him, the regulation clearly states that--uh, until those
steps you have just mentioned including the procedural
safeguards are taken, even if those were purported to be a
relief action, it would only be considered as a temporary
suspension from assigned duties even though it was intended
to be a relief."

(page 60) Q. "So are you telling me this was then a
temporary suspension?" A. "I'm not an expert in these
regulations...but here was eventually a GO approval of the
actions that were taken." Q. "And when was that
accomplished?" A. "That was accomplished on the 4th of
December 2000."

(page 61) Q. "Why did it take so long almost 11 months after
the relief for that to go up?" A. "...the person purporting to
take the action would be the initiator of that action to perform
that. That action apparently was taken by Colonel B___. It
did not come through my Headquarters. I do not track the
numerous personnel actions that are taking place through out
my Command."

(page 61-62) Q. "When did you first learn of the IG
Investigation? And not necessarily the DAIG?" A. "October
the 6th, 2000." Q. "Did that memorandum have anything to
do with the IG Investigation?" A. "Not to my knowledge. You
need to understand that I received a phone call from General
H___ on October the 6th which was – well, actually when they
said General H___ was on the phone I expected him to be
calling congratulating me on being confirmed by the
Senate...instead he called to tell me, uh, that I had been
withdrawn from consideration because of the complaint that
was filed against me...I was not told who filed the complaint or
what the basis of the complaint was. I had no knowledge of
that. So to answer your question, no."

(page 71) Q. "Do you believe...the timing of your 14 January
meeting with Lieutenant Colonel B___ and the relief was done
on the 26th of January and based on what you understand
now, do you believe that Captain W___ was given due
process?" Q. "If he was not given the opportunity--uh, to
rebut and the other procedural safeguards, then yes I believe
he was not proper--it was not properly handled." Q. "If he

9

ABCMR Record of Proceedings (cont)                    AR20070008429

wasn't given the opportunity to rebut those actions, would you
believe that based on what you know now that this may have
been an improper relief?"  A.  "Eh, I would believe that
procedurally it would be an improper relief..."

9.  On 21 May 2001, the applicant was interviewed by COL S___ (the same
COL S___ as in the 14 March 2001 interview), LTC W___, and Major W___
of the DAIG.  On page 1 of the 91-page typewritten report of this interview,
LTC W___ informed the applicant:

> "During the previous interview, you were advised that you
> were suspected of failure to ensure that a subordinate
> commander was properly relieved from a command position,
> improperly prepared and processed an officer efficiency
> report; and reprised against a soldier for making protected
> communications."

10.  The applicant indicated that he had not been apprised in the manner
LTC W___ had just read.  On page 3 he indicated that he was apprised in a
general nature of the allegations but not apprised of any definitive
allegations [at the time of the March 2001 interview].

> (page 3)  Q.  "In your first interview, we talked about those
> specifics?"  A.  "Okay."

> (page 3)  Q.  "...we're going to review the chronology of the
> events that took place, review personnel actions based on
> those events and then discuss the aspects of DOD 7050.6, the
> Whistleblower Reprisal Standard and tie everything
> together..."

11.  The first 30 pages or so and much of the rest of the 21 May 2001
interview dealt primarily with an earlier 15-6 investigation of allegations
against Staff Sergeant S___ and findings of misconduct on Major H___.

> (page 36)  Q.  "Sir, specific question--did Lieutenant Colonel
> B___ say to you he wanted Captain W___ to be reassigned
> during that 14---"  A.  "Did he say he wanted him
> reassigned?  Uh—you mean—uh, well, he would have to be
> reassigned---"  Q.  "Not connected to relief?  Let me qualify
> that.  Did he said he wanted him to be reassigned, no
> mention of relief?"  A.  "I have no recollection of that...."

10

ABCMR Record of Proceedings (cont)                AR20070008429

(page 54) Q. "There's some information that at some point
in time, Colonel T___ informed you or the rest of the staff
that Captain W___ and Major H___ had a responsibility to
report losses or suspected criminality by S___, and that that
was a responsibility they had under 600-20. What do you
recall about Colonel T___'s advice on that point?" A. "I
don't recall anything about it." Q. "Did anybody at any point
in time tell you that soldiers—uh, officers have
responsibilities to report losses like lost NVGs or alleged
criminality by subordinates?" A. "...I don't recall that
conversation. If somebody had stated that, I mean I would
say that's sort of a, you know, a blinding flash of the
obvious." Q. "Did anybody, Colonel D___ or the IG, ever
advise you that it's wrong to take corrective action or punish
somebody for reporting fraud, waste, abuse, losses,
etcetera?" A. "No." Q. "Do you think that it's wrong for
punish people for reporting those things?" A. "Yes." Q.
"Okay...do you think that's what you did right there, sir—" A.
"No. Q. "–with that 6 June letter of reprimand?" A. "I do
not."

(page 62) Q. "But the thing that's the real concern about
that relief action on W___, besides the procedural niceties is
that at the time he's relieved on 26 January, he's never been
given any idea why he's about to be relieved, any comments
about how to correct his behavior, any second chance to
improve. He got just yanked. How do you respond to that?
A. "...You're assuming that I was involved in the process of
relieving Captain W___. I was not involved in the process of
relieving Captain W___."

(page 65) Q. "...And then you have Captain W___ relief for
cause. You afford Sergeant S___ or take in consideration a
rebuttal, but there's no rebuttal for Captain W___. And I'm
just trying to understand why is there not consistent
treatment of a very significant adverse personnel action?" A.
"Colonel B___ is the officer in the chain of command who
afforded Sergeant S___ the rebuttal opportunity pursuant to
15-6...." Q. "Yes, Sir." A. "...Why would I do something
that Colonel B___ should do...You are assuming that I
consciously said, "Let's don't give Captain W___ the
opportunity to rebut these charges." That is in fact Not
true...I don't keep track of what Colonel B___ is supposed to

11

ABCMR Record of Proceedings (cont)                      AR20070008429

> do as battalion commander, not everything. I certainly want
> to know what's going on, but that's not one of the things high
> on my list...Maybe my JAG officer should follow up on that,
> but I got plenty of things on my plate not to worry about
> whether somebody's taking a step...I'm not diminishing the
> importance of that, but that wasn't my job to provide that
> notice to Captain W___. It was Colonel B___'s job."

12. On 29 June 2001, the DAIG Report of Investigation (ROI) concluded
that the applicant had failed to ensure that a subordinate commander was
properly relieved from a command position, that he had improperly prepared
and processed an annual OER on the complainant, and that he had
reprised against officers for making protected communications. The VCSA
approved the DAIG ROI on 29 June 2001 as well.

13. On 31 July 2001, the applicant was transferred to the USAR Control
Group (Retired) due to maximum authorized years of service for a COL,
O-6.

14. Army Regulation 623-105 (Officer Evaluation Reporting System), the
version in effect at the time, dated 1 October 1997, applied to officer
personnel in the Active Army, the Army National Guard of the United States,
and the USAR. In pertinent part, it stated that, to evaluate the rated officer,
the senior rater must normally have served in that capacity for a minimum of
60 calendar days. It also stated that when the senior rater had not been in
the position the minimum number of days necessary to render a report, he
or she would enter the following statement in part VIIc: "I am unable to
evaluate the rated officer because I have not been (his or her) senior rater
for the required number of days." These senior rater guidelines have been
in effect at least since the version of Army Regulation 623-105 dated June
1979.

DISCUSSION AND CONCLUSIONS:

1. The applicant contended in his Court action, in part, that his right to due
process was violated because "he was never informed by the DAIG orally or
in writing, of the specifics of the allegations against him at any time during
the investigation," that when he first learned of the allegations against him
on 14 March 2001 it was in a "cursory" manner," and that "[a]t no time
during the two interviews did the DAIG apprise [him] of the specific
allegations that formed the basis of the allegations against him."

12

ABCMR Record of Proceedings (cont)                AR20070008429

2. In their 14 March 2001 interview, the DAIG investigators informed the applicant, "You're advised that you are suspected of the following allegations which we want to question you about: That you improperly relieved an Officer; that you improperly processed Officer Evaluation Reports; and that you reprised against an Officer for making a protected communication."

3. In their 21 May 2001 interview, the DAIG investigators informed the applicant, "During the previous interview, you were advised that you were suspected of failure to ensure that a subordinate commander was properly relieved from a command position, improperly prepared and processed an officer efficiency report; and reprised against a soldier for making protected communications."

4. It is acknowledged that the 14 March 2001 advisory was not as specific as the 21 May 2001 advisory insofar as two of the allegations were concerned ("improperly relieved an officer" versus "failure to ensure that a subordinate commander was properly relieved from a command position" and "improperly processed Officer Evaluation Reports" versus "improperly prepared and processed an officer efficiency report").

5. Nevertheless, it is difficult to believe that based on the substance of the interviews, particularly the 14 March 2001 interview, that the applicant was not aware that the first allegation referred to the relief of Captain W___ from his battery command (pages 39, 43, 44, 46, 48, 49, 50, 52, 53, 60, 61, and 71 of the 14 March 2001 interview and pages 36, 62, and 65 of the 21 May 2001 interview) and the second allegation referred to the applicant acting as the senior rater on Captain W___'s 30 September 1999 annual Officer Evaluation Report (pages 9, 10, 25, 26, 27, 28, and 29 of the 14 March 2001 interview).

6. It is acknowledged that the specifics of the allegation of reprisal do not appear to be as unmistakably identified during the two DAIG interviews as the other two allegations. However, it appears the allegation of reprisal was also addressed in a prior IG investigation (i.e., on 16 January 2001, the FNG TAG contacted the applicant and informed him that the allegation of reprisal against the complainant had been unsubstantiated). Therefore, the fact the DAIG brought up the issue of reprisal should not have been a surprise to the applicant.

7. The applicant's right to due process was not violated. Based upon the content of the two DAIG interviews, it appears the "cursory" manner in which he was informed of the allegations during the introduction to the two

13

ABCMR Record of Proceedings (cont)                    AR20070008429

interviews was clearly expounded upon during the course of the interviews,
and he was given adequate opportunity to respond to the specific
allegations.

8.  It appears that based upon the applicant's responses to questions
concerning the allegations (e.g., (page 29 of the 14 March 2001 interview)
when he admitted to acting as a senior rater contrary to a regulatory
requirement that had been in effect for at least 20 years or (page 65 of the
21 May 2001 interview) when he stated keeping track of what one of his
battalion commanders does, especially in regards to relieving a subordinate
commander, was not one of the things high on his list), the Vice Chief of
Staff of the Army made a reasonable decision to approve the DAIG report.

<u>BOARD VOTE:</u>

_____  _____  _____  GRANT FULL RELIEF

_____  _____  _____  GRANT PARTIAL RELIEF

_____  _____  _____  GRANT FORMAL HEARING

_____  _____  _____  DENY APPLICATION

<u>BOARD DETERMINATION/RECOMMENDATION:</u>

The evidence presented does not demonstrate the existence of a probable
error or injustice.  Therefore, the Board determined that the overall merits of
this case are insufficient as a basis to amend the decision of the ABCMR
set forth in Docket Number AR2004105941 dated 11 August 2005.

CHAIRPERSON

14